**THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

SHAWNTAY ORTIZ, individually and on
behalf of L.J., her minor son, and as the Personal
Representative of MARTIN JIM, deceased,

       Plaintiff,

v.                                      No. 1:18-cv-00713-JCH-KRS

JOSHUA MORA, in his individual capacity,
BOARD OF COUNTY COMMISSIONERS OF
BERNALILLO COUNTY, and MANUEL
GONZALES, III, Bernalillo County Sheriff,

       Defendants.

### MEMORANDUM OPINION AND ORDER

In the aftermath of a car pursuit, Bernalillo County Deputy Sheriff Joshua Mora opened fire on the fleeing vehicle, killing both its driver, Isaac Padilla, and passenger, Martin Jim. Jim's surviving partner and minor child brought this 42 U.S.C. § 1983 action, contending that Mora unreasonably seized Jim by firing his gun when the chase had ended, the vehicle was stationary against a curb, damaged, and barricaded by two police cars. According to Mora, however, he shot at the vehicle after Padilla revved the engine, threatening the life of a nearby police officer.

After considering Defendants' motion for summary judgment on Plaintiff's § 1983 excessive force claim (ECF No. 25), the Court holds that a reasonable jury could conclude that Deputy Mora acted unreasonably. However, Mora violated no clearly established law and therefore is entitled to qualified immunity. The Court also holds that Plaintiff's Fed. R. Civ. P. 56(d) motion for additional discovery (ECF No. 37) is granted and the Defendants' second filed summary judgment motion (ECF No. 26) is denied without prejudice.

## I.      FACTUAL BACKGROUND

Most of the events of this case were recorded by a thermal imaging infrared camera attached to a police helicopter, which is entirely soundless and in many instances blurry. Other events were recorded from police officers' belt tapes and a traffic camera. Consequently, the Court describes the facts "in the light depicted by the videotape," *Scott v. Harris*, 550 U.S. 372, 381 (2007), while recognizing that any gaps or uncertainties left by the video are construed in the light most favorable to Plaintiff as the summary judgment nonmovant. *See Carabajal v. City of Cheyenne, Wyoming*, 847 F.3d 1203, 1207 (10th Cir. 2017) (where video evidence does not capture all that occurred the court "continues to view the evidence in the light most favorable to [the plaintiff].") Facts are also provided by deposition testimony, affidavits, post-shooting reports, and other evidence presented.[1]

On November 17, 2017 around 3:45 a.m., police dispatch reported that a police helicopter using thermal imaging was tracking a stolen white Dodge pickup truck in southeast Albuquerque. Defs.' Undisputed Fact (UF) ¶¶ 2-4, ECF No. 25. The truck exited Interstate 40 and pulled into a gas station near an intersection off the interstate. *Id*. ¶ 5. Albuquerque Police Officer Pete Tartaglia pulled into the gas station and switched on his emergency lights. UF ¶ 6.

As Officer Tartaglia exited his police car, the Dodge drove off. *Id*. ¶ 7. The Dodge then drove to a nearby neighborhood, hitting a traffic cone and driving in the wrong lane of travel as it did so. UF ¶ 8. As the vehicle stopped on a neighborhood street, an individual exited from the driver's side, and then the vehicle fled once more. *Id*. ¶¶ 8-9; Cordova Aff. ¶ 4, ECF No. 25-4.

---

[1] Defendants put forward 78 proposed undisputed material facts. For purposes of the summary judgment motion only, Plaintiff conceded the first 55, describing them as "largely immaterial" background facts having no relevance to the precise moment Mora used deadly force. However, an "analysis of both the moments before the shots were fired and the prior interactions between the officer and the subject," is relevant to the reasonableness assessment. *Latits v. Phillips*, 878 F.3d 541, 548 (6th Cir. 2017). Therefore, the Court will describe and analyze the events leading up to Mora's use of deadly force.

Police promptly apprehended the individual, and Deputy Mora heard over dispatch that the person had a gun. UF ¶ 10.

For the next seven minutes, from about 4:00 to 4:07 a.m., the Dodge wound its way through city streets, heading towards Albuquerque's westside. *Id.* ¶¶ 11-14. As it did so, the vehicle passed through at least 18 major intersections with traffic lights without stopping.[2] *Id.* ¶¶ 11, 13-14. Bernalillo County Sheriff Deputy Sergio Cordova had taken position near the intersection of Montaño Road and Fourth Street, anticipating the Dodge's approach. Cordova Aff. ¶ 7. As the truck turned onto Montaño, Deputy Cordova covertly followed it, watching the Dodge flicker its headlights on and off and speed past another car. *Id.* ¶ 17; UF ¶ 17. As the Dodge continued its westbound travel on Montaño, it ran a red-light and traveled with its headlights off. *Id.* ¶ 19.

As Deputy Cordova maintained his covert pursuit of the Dodge onto Unser Boulevard, other officers set up tire spikes at other locations. *Id.* ¶ 22. At about 4:14 a.m., the Dodge approached, but avoided, one set of spike strips. *Id.* ¶ 23. Hearing this, Deputy Mora attempted to set up a spike strip near the intersection of Unser and Ladera Drive. *Id.* ¶ 24; Defs.' Ex. A, ECF No. 29-1. But as he was unwinding the strip, the Dodge "barrel[led] towards [him]" from his left and he and could hear the "roar of the engine, the whine, the RPMs [] continued and the sound to get higher and higher," so he "thr[ew]" the strip, retreated, and watched as the Dodge maneuvered to avoid the spikes. *Id.* The police helicopter continued tracking the Dodge's course, broadcasting to officers that the vehicle was speeding through a neighborhood in the wrong lane of traffic and with its headlights off. UFs ¶¶ 29-30.

---

[2] The parties do not say whether the traffic lights at each of these major intersections were green or red when the Dodge encountered them and thus whether Padilla disregarded them. Moreover, throughout the entire chase, the helicopter video shows the Dodge traveling down mainly empty roads, encountering very few other vehicles.

Deputy Mora watched the Dodge run a stop sign as it turned onto Ladera and head toward Ouray Road, where officers had set up another set of tire spikes. *Id.* ¶¶ 31, 33. Although Deputy Mora heard over the radio that the Dodge had hit the spikes, the truck continued its course, speeding past another motorist while driving in the middle of Ouray Road and kicking up debris. *Id.* ¶¶ 33-35.

In their separate police cars with the sirens on, Deputies Cordova and Chavez gave chase, pursuing the Dodge as it turned onto a frontage road, drove over a median and through several large plastic pylons, sparks emitting from one of its wheels. Chavez Aff. ¶ 36, ECF No. 25-5; UFs ¶¶ 36-38. The Dodge then drove south into the northbound lanes of traffic on Coors with its headlights off, forcing at least one other motorist to swerve. *Id.* ¶¶ 39-41. At this point, Deputy Mora believed that the driver of the Dodge had committed the felony of aggravated assault with a deadly weapon. *Id.* ¶ 42.

Deputy Chavez then attempted a Pursuit Intervention Technique (PIT), a ramming maneuver to make the driver abruptly "spin out" so the driver loses control and stops. Chavez Aff. ¶¶ 45-47. The deputy's PIT was unsuccessful, though, and the Dodge continued its pursuit in the wrong lanes on Coors. *Id.* ¶ 47. Deputy Chavez, who was himself in the wrong lanes of travel at this point as he pursued the Dodge, noticed oncoming motorist vehicles, so he backed-off to give motorists room to safely maneuver their vehicles. *Id.* ¶ 49. The Dodge fled into a residential area and Deputy Chavez continued his chase, ramming the Dodge in another PIT on a residential street, but Chavez ended up disabling his own police car in the process, bringing his pursuit to a halt. *Id.* ¶¶ 51-55.

Deputy Cordova continued to pursue the Dodge though. UF ¶ 49. The fleeing vehicle ran a stop sign, nearly colliding head-on with another motorist headed east on Hanover Road. *Id.* ¶

51. As the Dodge attempted to exit the residential area and get back onto Coors, Deputy Cordova attempted a third PIT. *Id.* ¶ 52. The Dodge momentarily fishtailed, but Padilla regained control, drove north in the southbound lanes on Coors, and then drove over the median to gain passage into the southbound lanes. *Id.* ¶ 53.

Seconds later, Deputy Cordova successfully rammed the Dodge in a fourth PIT near the intersection of Coors and Glenrio. *Id.* ¶ 54. The Dodge spun-out and came to a standstill in the northwest corner of the intersection, its front wheels abutted against a curb. *Id.* ¶ 55; Pl.'s Ex. 1B, ECF No. 35-1. The area where the Dodge stood still appears to be a large, vacant tract. Helicopter footage does not show the presence of passing pedestrians or members of the public. A post-shooting photograph of the truck shows the front driver's wheel obliterated, the tire rim exposed. Pl.'s Ex. 1C, ECF No. 35-1.

After the Dodge came to a standstill, Sergeant Gaitan came on the scene in his police sedan. *Id.* ¶ 58. Gaitan pulled in front of the Dodge at an angle and "up against the bumper of the [Dodge]," to "prevent the [Dodge] from driving forward." Pl.'s Additional Undisputed Material Facts ¶¶ A, B (AUF). Cordova, too, blocked the Dodge's path with his police SUV, also positioning his SUV at an angle and near the Dodge's front bumper. *Id.* ¶ C; Defs.' UF ¶¶ 58, 60. This arrangement blocked the Dodge behind the police vehicles so that the Dodge could not easily flee, although nothing stopped the Dodge's backward travel.

As for Deputy Mora, he parked his car at a distance away from the Dodge. Defs.' UF ¶¶ 56-57. He then approached the Dodge on foot, pointed his handgun-mounted light at the driver and ordered Padilla to put his hands up because Padilla was "reaching down" toward the center console. UF ¶ 59; ECF No. 29-1 at 11. Padilla did not obey, although it is unknown whether Padilla heard the commands, and it is undisputed that no gun was found in the vehicle. *Id.* at 11-

12; Pl.'s Resp. Br. at 6 n.2. Deputy Cordova had exited his police SUV by this point, drew his firearm, and used his open driver's door as cover. Pl.'s AUF ¶ E. Cordova was also commanding Padilla to put his hands up, and he also saw Padilla reach for something on the truck's floor. Cordova Aff. ¶¶ 64-66.

As Mora stood roughly adjacent to the driver's side of the Dodge, he heard the Dodge's engine revving, leading Mora to believe that Padilla was hitting the accelerator to flee. *Id*. ¶ 66. Sergeant Gaitan stood behind the barrier formed by the police cars angled against the Dodge's front. In a post-shooting interview, Mora described what occurred next as follows:

> Deputy Gaitan was out of his unit and I could see Deputy Gaitan in my peripheral vision to the left and knew that he was directly in the path of the truck, uh, it was at that same time, as all this was unfolding, that the driver punched the gas as far as he could and it was just a constant whine, it was just [] he was actively trying to put the truck into gear. The gear shift was up here at the right side of the steering wheel, he was moving it up and down. Uh, I was, I was scared that if he got that vehicle into gear Deputy Gaitan would be ran [sic] over.

ECF No. 29-1. Mora shot seven rounds at the vehicle, killing both Padilla and Mr. Jim, who was a backseat passenger. UF ¶¶ 72, 75. Mora did not know of Jim's presence. *Id*. ¶ 76. Almost immediately, the Dodge reversed away from the officers in an uncontrolled loop as Padilla's lifeless foot remained on the accelerator before finally came to a stop. Pl.'s Resp. Br. ¶ 5. The time it took for Mora to exit his police vehicle, run towards the site, yell demands, and finishing firing his weapons occurred within about 18 seconds.

Deputy Cordova said that he heard the sound of the Dodge's revving engine at the time Mora fired the shots. Defs.' UF ¶ 73. In an affidavit, he said that "if the revving sound coming from the truck turned into forward movement, either myself or Sgt. Gaitan could have been seriously injured or killed by the truck." Cordova Aff. ¶ 69. Similarly, Gaitan said in an affidavit that as Padilla revved the engine he was located "directly in the truck's path of travel behind my

unit, which sat significantly lower than the stolen truck" and that he believed Padilla "was going to ram through my unit and through me," because of Padilla's prior conduct and revving his engine. Gaitan Aff., ECF No. 25-7 ¶¶ 35-56. However, when Cordova was asked why he did not fire his weapon at the Dodge, Cordova answered that he "did not have a threat that [he] needed to fire [his] firearm." Pl.'s AUF ¶ F. Likewise, when Sergeant Gaitan the same question he answered that he "was either slow to react or acting on training and experience." *Id*. ¶ G.

Under Plaintiff's version of the story, Gaitan was not directly in the truck's path of travel, as Mora claims. Gaitan could not have been struck by the Dodge, Plaintiff says, because the two police cars behind which Gaitan stood made the Dodge's forward travel impossible. Plaintiff does not dispute that Padilla revved the Dodge's engine at the time Mora fired the fatal shots. However, Plaintiff contends that a reasonable jury could conclude that Mora should have known that the Dodge posed no risk when it was stationary behind the police cars, its front wheels against a curb with one of its tires obliterated, and no officers were behind the truck, its only escape route. Plaintiff further contends that a jury could conclude that Mora overreacted given Deputy Cordova's statement that he did not perceive a need to shoot and Sergeant Gaitan's statement – despite being the most imperiled officer – that he did not shoot because either he was slow to react or acting on training and experience.

## II.    PROCEDURAL HISTORY

On August 8, 2018, Plaintiff filed a five-count amended complaint in federal court against Deputy Mora, the Board of County Commissioners of Bernalillo County, and Bernalillo County Sheriff Manuel Gonzales, III, alleging claims for relief under federal and state-law. Plaintiff brought a § 1983 excessive force claim under the Fourth Amendment against Deputy

Mora (Count I); a municipal liability or "*Monell*[3] claim" against the County (Count II); a supervisory liability claim against Sheriff Gonzales (Count III); and state-law loss-of-consortium claims asserted by Mr. Jim's partner, Shawntay Ortiz (Count IV), and the couple's minor son, L.J. (Count V).

With only limited discovery conducted, Defendants filed two motions for summary judgment: the current motion targeting Plaintiff's § 1983 excessive force claim (Count I), and one targeting Plaintiff's § 1983-claims against the County and Sheriff on theories of municipal and supervisory liability (Counts II and III). Plaintiff filed no response to the latter motion. Instead, Plaintiff moved under Fed. R. Civ. P. 56(d), asking the Court to deny or defer ruling on that motion and requested time for additional discovery to present facts to oppose the summary judgment motion.

Plaintiff tells the Court that she took depositions of three current and former BCSO officers in a related state-court case. Some testimony from at least one of these officers paints a picture of Deputy Mora as violent and lacking impulse control, Plaintiff says. For instance, Leonard Armijo, Deputy Mora's police academy instructor, testified that Mora was a failure in the police academy, and Plaintiff suggests that he nonetheless gained his position through family nepotism because his father, Rudy Mora, is the undersheriff of BCSO. Mora was initially denied entry into the police academy the first time he applied because he failed a polygraph. Once he finally did gain admission, Plaintiff says he exhibited aggressive behavior as a cadet. Armijo testified that Mora failed a nonuse of force prisoner transport role-playing exercise because he put the actor on the hood of a car and then slammed him onto pavement. Likewise, in another

---

[3] *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 691 (1978).

role-playing exercise that Armijo did not witness but heard about, Mora struck the actor in the head with such force that she had a concussion.

Armijo also testified that Mora did not take Armijo's driving class seriously. One day Armijo even removed Mora from the driving course because of his care-free attitude. Following a lunch break, Sheriff Gonzales and Undersheriff Rudy Mora showed up at the driving track. Armijo testified that this had never happened in Armijo's nine-years of teaching the driving class. Armijo told Undersheriff Mora that his son and other cadets were "fucking around," in his driving course and that in Armijo's experience "some people make it, some people don't," referring to passing the class. ECF No. 37-2 21:14-17. At first Undersheriff Mora responded nonchalantly, "they will pass." *Id*. at 21:18-19 Armijo repeated that some cadets pass, some do not. In a louder tone, the undersheriff repeated, "well, they will pass." *Id*. 21:25. This exchange continued once more. Armijo told Undersheriff Mora that his son had to listen to the trainers, and the undersheriff responded "well, they will pass," before turning and walking away. *Id*. at 22:15. Riled by this exchange, Armijo voluntarily removed himself as Mora's instructor.

Plaintiff also submitted internal correspondence from Captain Andi Taylor, the South Area Commander, Field Services Division regarding an "Early Warning Alert" for Deputy Mora that Taylor investigated. ECF No. 37-1. According to Taylor, Mora's involvement in four vehicle pursuits triggered the Early Warning Alert. Taylor ultimately concluded that that he "had no cause for concern," regarding Mora's involvement in those pursuits. *Id*. However, Taylor did write that Mora "could slow down and use verbal de-escalation techniques rather than going hands on." *Id*.

In addition to these depositions and internal correspondence, Plaintiff says in her Rule 56(d) motion that there is likely "much, much more" evidence concerning Mora's record, and

that Mora's alleged acquisition of his job through nepotism and allegedly troublesome performance as a cadet and deputy is relevant to her *Monell* claim. ECF No. 37 at 2.

Defendants point out that they have already turned over to Plaintiff relevant evidence in the state case. For example, Plaintiff sought production of complaints filed against Deputy Mora, to which Defendants had no responsive documents. In their initial disclosures, Defendants also provided Plaintiff Mora's BCSO training certificates.

## III. DISCUSSION

### A. Standard of Review

Plaintiff brings this action under 42 U.S.C. § 1983, which "allows an injured person to seek damages against an individual who has violated his or her federal rights while acting under color of state law." *Cillo v. City of Greenwood Vill.*, 739 F.3d 451, 459 (10th Cir. 2013). "Section 1983 creates no substantive civil rights, only a procedural mechanism for enforcing them." *Wilson v. Meeks*, 52 F.3d 1547, 1552 (10th Cir. 1995), *abrogated on other grounds by Saucier v. Katz*, 533 U.S. 194, 205 (2001). "In defending against § 1983 claims like the ones at issue here, an official may plead an affirmative defense of qualified immunity." *Maresca v. Bernalillo Cty.*, 804 F.3d 1301, 1307 (10th Cir. 2015).

In reviewing a summary judgment motion based on qualified immunity, the court views the evidence "in the light most favorable to the opposing party." *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam) (citation omitted). "Because of the underlying purposes of qualified immunity, [the Tenth Circuit] review[s] summary judgment orders deciding qualified immunity questions differently from other summary judgment decisions." *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001). "When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff, who must clear two hurdles in order to defeat the defendant's

motion." *Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009). That burden requires a plaintiff to show that the state official "(1) [] violated a federal statutory or constitutional right, and (2) the unlawfulness of [the official's] conduct was clearly established at the time." *District of Columbia v. Wesby*, —— U.S. ——, 138 S. Ct. 577, 589 (2018) (internal quotations and citations omitted).

"[The district court] may decide 'which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case.'" *Quinn v. Young*, 780 F.3d 998, 1004 (10th Cir. 2015) (quoting *Pearson v. Callahan,* 555 U.S. 223, 236 (2009)). "[I]f the plaintiff fails to establish either prong of the two-pronged qualified-immunity standard, the defendant prevails on the defense." *A.M. v. Holmes*, 830 F.3d 1123, 1134–35 (10th Cir. 2016) (citing *Felders ex rel. Smedley v. Malcom*, 755 F.3d 870, 877–78 (10th Cir. 2014) ("[T]he record must clearly demonstrate the plaintiff has satisfied his heavy two-part burden; otherwise, the defendants are entitled to qualified immunity.") (internal quotation marks and citation omitted). In considering whether an officer is entitled to qualified immunity, the district court "considers only the facts that were knowable to the defendant officers." *White v. Pauly*, —– U.S. ——, 137 S.Ct. 548, 550 (2017) (per curiam). A government official can claim qualified immunity even if the official was mistaken about the facts or the law. *See Pearson*, 555 U.S. at 231.

### B. Excessive Force Claim

To state an excessive force claim under the Fourth Amendment, the Plaintiff must show that (1) a "seizure" occurred and (2) the seizure was "unreasonable."[4] *Bella v. Chamberlain*, 24

---

[4] The parties dispute whether Jim was "seized" in the first place. Defendants say that Jim was the unintentional victim of Mora's otherwise intentional shooting at the Dodge. The majority of federal circuits have ruled that a passenger shot by an officer during the course of a vehicle chase

F.3d 1251, 1255 (10th Cir. 1994) (quoting *Brower v. County of Inyo*, 489 U.S. 593 (1989)). "[A]pprehension by the use of deadly force is a seizure ...." *Tennessee v. Garner,* 471 U.S. 1, 7 (1985). Because Defendants have invoked the qualified immunity defense, Plaintiffs must also show that objectively reasonable officers could not have thought the force used was constitutionally permissible, in other words, they violated clearly established law. *Cortez v. McCauley*, 478 F.3d 1108, 1128 (10th Cir. 2007).

Claims of excessive force are analyzed under the objective reasonableness standard of the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 395-97 (1989). The reasonableness of the officer's belief as to the appropriate level of force should be judged from the perspective of an officer on the scene, rather than with the 20/20 vision of hindsight. *Id.* at 396. Among the factors that courts should consider in determining whether a police officer applied excessive force are (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight. *Id.* "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*. Further, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense,

---

is "seized." *See Davenport v. Borough of Homestead*, 870 F.3d 273, 279 (3rd Cir. 2017) (collecting cases). Apparently the Tenth Circuit has acknowledged, but not decided the issue. *See Carabajal*, 847 F.3d at 1212 (declining to address issue, and instead holding that qualified immunity shielded officer who fired his weapon at a car full of people because the law was unclearly established as to whether a passenger could be seized). But in *Carabajal*, the Tenth Circuit also suggested that if an officer reasonably seized the driver of a car, then it "follows" that any seizure of a passenger is also reasonable. *See id*. at 1214. Thus, the starting point for the Court's analysis is whether Mora acted reasonably. If so, it follows that any seizure of Jim was reasonable.

uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97.[5]

"Deadly force is such force that create[s] a substantial risk of causing death or serious bodily harm." *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1313 (10th Cir. 2009) (citation and quotation omitted). The use of deadly force is considered reasonable "only if a reasonable officer in Defendants' position would have had probable cause to believe that there was a *threat of serious physical harm to themselves* or to others." *Id.* (quoting *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008) (emphases in original). In assessing the degree of threat the suspect poses to the officer, the Tenth Circuit has identified factors that include, but are not limited to: "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect." *Estate of Larsen*, 511 F.3d at 1260. These four factors and the three factors set forth in *Graham* cannot be applied mechanically, the district court "must still slosh our way through the factbound morass of 'reasonableness,'" *Scott v. Harris,* 550 U.S. 372, 383 (2007). Lastly, "if threatened by [a] weapon (which may include a vehicle attempting to run over an officer), an officer may use deadly force." *Thomas v. Durastanti*, 607 F.3d 655, 664 (10th Cir. 2010).

### i. Constitutional Right

---

[5] In the Tenth Circuit, "[t]he reasonableness of the use of force depends not only on whether the officers were in danger at the precise moment that they used force, but also on whether the officers own reckless or deliberate conduct during the seizure unreasonably created the need to use such force." *Jiron v. City of Lakewood*, 392 F.3d 410, 415 (10th Cir. 2004) (citation and quotation marks omitted). In this case, neither party argued that Mora created the need to use force and therefore the Court lacks legal analysis to consider this component.

Deputy Mora and Defendants claim that Mora's use of force against Jim—shooting him seven times after the Dodge came to a standstill—was objectively reasonable because Padilla had just led officers on a lengthy, dangerous flight and when Mora shot the car Padilla was revving the engine with Gaitan standing in the car's direct path of travel. Plaintiff contends that Mora shot the Dodge only after the truck had clearly become disabled behind two police cars and no longer posed a threat. The Court concludes that the differing accounts present a genuine question of fact and that, at this stage, Plaintiff has presented sufficient evidence from which the trier of fact could find the existence of a constitutional violation.

Turning to the *Graham* factors, the first factor weighs in the Defendants' favor. Mora had ample probable cause to believe that Padilla committed the crime of aggravated assault with a deadly weapon during the chase. Crimes committed during the course of an encounter can justify deadly force. This factor firmly weighs in the Defendants' favor.

The second and third *Graham* factors—whether the suspect posed an immediate threat to the safety of the officers or the public, and whether the suspect is actively resisting arrest—must be analyzed at the "precise" moment that Mora officer used force. *Durastanti*, 607 F.3d at 666. There is no doubt that Padilla was evading the officers until his truck spun-out, so the third factor weighs in favor of the Defendants.

The heart of this case lies at the second factor—immediacy of harm. This factor is a much closer call. Defendants vigorously argue that Padilla's prior reckless conduct reasonably led Mora to believe that the chase had not ended by the time Mora fired. They describe the imminent need for force because Padilla:

> Fled from law enforcement for approximately twenty eight minutes across Albuquerque metropolitan area. In particular, Padilla drove at a high rate of speed, he turned his headlights off at times, and he did not obey traffic signals.

> After three sets of spike strips, two narrowly avoided head-on collisions with civilian motorists, wrong way travel on residential streets and major thoroughfares, three unsuccessful [PITs] and one successful PIT, Padilla was stopped. Nonetheless, Padilla refused to put his hands up and he attempted to flee once again by flooring the gas pedal on his stolen truck while the front bumper of a full-size truck was feet away from two [deputies].

ECF No. 25 at 1-2 (numbers omitted).

In support of their arguments, both parties discuss the Supreme Court's decision in *Plumhoff v. Rickard,* 572 U.S. 765 (2014). In that case, a police officer stopped Rickard's car because a headlight was out. *Id.* at 768. The officer asked Rickard to step out of the car because he appeared nervous and could not produce a driver's license, but instead Rickard sped-off and led police on a high-speed chase. *Id. at* 768-69. Eventually, Rickard's car hit a police cruiser, causing Rickard's car to spin-out in a parking lot, where it hit another police cruiser. *Id.* at 769. "Now in danger of being cornered" by police cruisers, Rickard put his car in reverse to try to escape. *Id.* Rickard's car "made contact with" yet a third police cruiser, and Rickard's "tires started spinning," and the car rocked back-and-forth, suggesting Rickard was flooring the gas pedal "even though his bumper was flush against a police cruiser." *Id.* at 770. At that point—and even though Rickard's car "came temporarily to a near standstill," *id.* at 776—an officer fired three shots into his car. *Id.* at 770. Rickard "then reversed in a 180 degree arc and maneuvered onto another street, forcing [another officer] to step to his right to avoid the vehicle." *Id.* (internal quotation marks omitted). Then, after Rickard's car had passed the officer and "continued fleeing," officers "fired 12 shots toward Rickard's car, bringing the total number of shots fired during th[e] incident to 15." *Id.* (internal quotation marks omitted).

In analyzing the first-prong of the qualified immunity inquiry, the Supreme Court held that the officers reasonably used deadly force to end the chase. "Rickard's outrageously reckless driving," included speeding over 100 miles per hour over five minutes and passing more than

two dozen other vehicles, forcing the cars to alter course. *Id*. at 776. Even though Rickard's car "came temporarily to a near standstill," when it hit a police cruiser, "that did not end the chase," because within three seconds Rickard "resumed maneuvering" his car. *Id*. When the officer fired the first three shots, the only thing "a reasonable police officer could have concluded was that Rickard was intent on resuming his flight and that, if he was allowed to do so, he would once again pose a deadly threat for others on the road." *Id*. at 777. As for firing the other volley of 12 shots after Rickard had maneuvered past officers and continued fleeing, the Supreme Court held that officers acted reasonable because over the "10-second span when all the shots were fired, Rickard never abandoned his attempt to flee." *Id*.

Defendants are no doubt correct that Padilla had engaged in a reckless flight using the Dodge, and that Padilla's prior dangerous flight matters in assessing the reasonableness of his conduct. Padilla drove with his headlights intermittently off, traveled numerous times in the wrong lanes of travel on a major thoroughfare and residential streets, hopped a median, and forced at least one motorist to swerve to avoid the Dodge. Given Padilla's prior flight and revving the engine, Mora reasonably could believe that he was still using the car as a deadly weapon. "It is well-settled that vehicles may be used as weapons and that such use 'may allow the use of deadly force,'' *Durastanti*, 607 F.3d at 665, 671. But the threat of harm to the officers or the public must be "actual and imminent" to "shift the calculus in the direction of reasonableness." *Cordova v. Aragon*, 569 F.3d 1183, 1190 (10th Cir. 2009). Moreover, "circumstances may change within seconds eliminating the justification for deadly force." *Durastanti*, 607 F.3d at 666.

The Court finds that even under *Plumhoff* there is a genuine issue of material fact about whether an officer on the scene would have perceived the need to use deadly force at the time

Mora did. On one hand, the summary judgment evidentiary record shows that Mora reasonably could have concluded that Padilla's flight was not over after the truck came to a standstill. It is undisputed that Padilla was revving the engine. The police helicopter video shows what appears to be a plume of debris, suggesting that the Dodge's wheels were spinning throughout the encounter. Padilla looked deranged during the encounter and Mora watched him moving the gear shift despite police commands to put his hands up. Padilla was trying to put the Dodge into four-wheel drive, which suggests he was trying to gain traction to move the vehicle. Just like in *Plumhoff*, Padilla's car collided with a police car and came to a standstill with Sergeant Gaitan's police car "up against the bumper of the [Dodge]," along with Cordova's car. Padilla, like Rickard, spun his tires and floored the gas pedal. And importantly, Gaitan was feet from the truck and within its projected path of travel. All three officers said in affidavits or post-shooting reports that they feared that either Cordova or Gaitan could have been seriously injured or killed by the truck.

On the other hand, however, the evidentiary record contains important facts that set this case apart from *Plumhoff*. The first difference has to do with temporal factors. In *Plumhoff*, after Rickard's car came to a standstill for three seconds, Rickard floored the gas pedal so that his tires spun and then managed to break free from the police car he hit, reverse, and drive away. *Id.* at 776-77. Officers fired three shots while Rickard was trying to break free of the police car, and the remaining 12 shots as Rickard drove away. *Id.* at 770. Here, by contrast, the Dodge was stopped for roughly 18-seconds (the time it took for the Dodge to come to a standstill, Mora to run towards the truck, and finish firing his weapon) whereas in *Plumhoff*, Rickard's car stopped for only three seconds. Rickard broke free of police cars and resumed flight; here, Padilla did not because two police vehicles made Padilla's forward travel impossible. The Dodge did not move

the entire 18-seconds. Even though an 18-second standstill may not be significantly greater than a three-second standstill, "circumstances may change within seconds eliminating the justification for deadly force." *Durastanti*, 607 F.3d at 666. A reasonable jury could conclude that the longer timeframe sets this case apart from fleeing vehicular suspects in *Plumhoff* and other cases focusing on temporal factors. *See e.g. Lytle v. Bexar Cty., Tex.*, 560 F.3d 404, 414 (5th Cir. 2009) (interval of "anywhere from three to ten seconds, perhaps even more," that it took for fleeing suspect to reverse towards the officer and then flee away affected reasonableness of officer's firing at the fleeing vehicle); *Pace v. Capobianco*, 283 F.3d 1275, 1282-83 (11th Cir. 2002) (where fleeing driver was cornered by police in a cul-de-sac with his car pointed towards a curb, for "at most, a very few seconds" and the officer fired shots "within a moment" of the vehicle stopping, it was reasonable to believe that the chase was ongoing given that the suspect remained in car with the engine running and disobeyed police commands to exit his car.)

The second difference has to do with the Dodge's position behind two police cars, a curb, and with a tire rim was exposed and the officers' proximity to the Dodge. In *Plumhoff* one officer was close enough to Rickard's vehicle that he pounded his gun on the window as Rickard floored the accelerator, and another officer had to step to avoid Rickard's vehicle once he regained flight. 572 U.S. at 769-70. Here, in contrast, at the time Mora opened fire, officers were on the other side of the police cars that blocked the Dodge's forward path. Defendants contend that a reasonable officer in Mora's position would reasonably believe that the barricade had not ended the chase given Padilla's prior flight, revving engine, and disregard of police commands – and that Padilla was about to run over Gaitan as he stood in the Dodge's path and Mora had seconds to react. However, the Court must draw inferences in Plaintiff's favor. Accordingly, the Court assumes that Padilla's spinning of the wheels, revving the engine, and efforts with the gear shift

evince Padilla's attempt to reverse the truck into an empty, vacant dirt lot which shows no police, pedestrians or members of the public. Also drawing inferences in Plaintiff's favor, her evidence shows Cordova did not fire his weapon because he "did not have a threat that [he] needed to fire [his] firearm." Pl.'s AUF ¶ F. Likewise, Gaitan – the more imperiled officer – did not fire his weapon, saying he was uncertain whether he was "slow to react or acting and reacting on training or experience." *Id.* ¶ G.

Plaintiff's evidence sufficiently distinguishes this case from those cases where officers stood directly in a fleeing vehicle's path with mere seconds to react. For example, in the Tenth Circuit's case *Thomas v. Durastanti*, 607 F.3d at 659, plain-clothes agents in an unmarked vehicle called in a uniformed officer to pull over a suspicious Lincoln. *Id.* at 660. The Lincoln pulled into a gas station at about the same time that the agents entered the parking lot and partially blocked the driveway that was the Lincoln's most obvious escape route. *Id.* At the same time, a state trooper responded and pulled into the gas station and parked behind the Lincoln. *Id.* Soon after, the following events occurred:

> In an effort to get away, Mr. Smith began to drive the Lincoln out of the parking lot, maneuvering around the ATF agents' SUV, which was partially blocking the Lincoln's path. Agent Thompson, who was approaching the driver's side of the Lincoln, had to move out of the way of the Lincoln; as he did so, Agent Thompson hit the Lincoln's front passenger window with the butt of his weapon, trying to break the glass. Agent Durastanti proceeded from the driver's side of the agents' SUV toward the rear of that vehicle and into the path of the Lincoln as it headed around the agents' SUV toward the parking lot exit. Agent Durastanti would testify later that he was concerned that Agent Thompson was in distress, that the Lincoln was coming directly at him and his objective was to stop the Lincoln. Agent Durastanti fired several shots at the driver. The Lincoln, nevertheless, continued out of the parking lot, hitting Agent Durastanti, who rolled off its hood, landed on his feet, turned around and then fired two more shots at the back of the Lincoln as it proceeded down the street away from the Valero station.... Ultimately, the Lincoln stopped a few blocks away. Mr. Smith had been shot in the head; Mr. Thomas had suffered a gunshot wound to his leg.

607 F.3d at 661 (internal citation omitted). Concerning the first round of gunshots, the Tenth Circuit held that Agent Durastanti's acted objectively reasonable because the driver was advancing towards Durastanti and placed him in harm's way with mere seconds to react. *Id.* at 665-66.

The Tenth Circuit relied heavily on *Durastanti* in the 2017 case *Carabajal v. City of Cheyenne,* 847 F.3d 1203 to likewise conclude that an officer reasonably fired at a driver who slowly moved his car mere feet towards the officer after the officer had told the driver to not start the car engine. In that case, Carabajal drove the speed limit and used his turn signals during a police chase before finally stopping after driving six-blocks. *Id.* at 1207. The pursuing officer told Carabajal to not run and to keep his hands visibly out of the car windows. *Id.* Carabajal momentarily opened his door and put his foot outside of the car, but then got back in the car and shut the door. *Id.* at 1208.

At the same time, a backup officer arrived at the scene, stood in front of Carabajal's car, and shouted "Don't start or I'll shoot," as he aimed his gun at the car. *Id.* Despite this warning, the car slowly moved towards the officer. *Id.* Three seconds later, the officer fired two rounds directly at Carabajal. *Id.* The vehicle continued to "roll forward" so slowly that the officer was able to put his foot on the bumper to try to stop its forward movement. *Id.* In analyzing the first prong of the qualified immunity analysis, the court concluded that the officer acted reasonably. *Id.* at 1209. Carabajal's "equivocal compliance with police directives," included eluding police for six-blocks, getting out of his car but then back in, and the car moving forward despite the officer's warning and the officer was not "required to stand down and hope for the best." *Id.* at 1210. *Durastanti* and *Carabajal* involved suspects driving directly towards officers, whereas

here Plaintiff's evidence raises a triable issue of fact concerning the immediacy of harm posed to the officers.

Finally, the Court turns to a case that Plaintiff cites to show that Mora acted unreasonably, *Cordova v. Aragon*, 569 F.3d 1183 (10th Cir. 2009). On appeal, the limited question before the Tenth Circuit was whether the potential risk to third parties created by a fleeing suspect's previous reckless driving was alone sufficient to justify the officer's shooting him. *Id.* at 1187-88. The officer stipulated that he was not imperiled and that no innocent bystanders were in the area. *Id.* The Tenth Circuit, while recognizing that an officer may use deadly force to apprehend a fleeing felon who poses grave threat of harm to officers or others, held that this "does not mean that any risk of physical harm to others, no matter how slight, would justify any application of force, no matter how certain to cause death." *Id.* at 1190. "When an officer employs such a level of force that death is nearly certain, he must do so based on more than the general dangers posed by reckless driving." *Id.* "[T]he general risks" or "risk of future harm" to motorists created by the driver's reckless flight were insufficient to justify the shooting because no other motorists were, in fact, in the area and motorists who happened to come along could have avoided an accident. *Id.*

However, the Tenth Circuit said in the following paragraph that

The threat to the officers themselves—if actual and imminent—could of course shift the calculus in the direction of reasonableness. If a reasonable officer in Officer Aragon's position would have feared for his life or the life of his fellow officers, then on one side of the scales would sit not only the potential (even if distant) risk to any motorist who might wander along, but also the very immediate risk of death to the pursuing officers. The urgency of terminating the chase would increase and the balance would tip in the officers' favor. The use of deadly force—even of the level nearly certain to cause death—would likely be justified. Here, however, the threat to the officers is a disputed fact, and for purposes of the summary judgment motion the district court explicitly assumed the officers to be in no immediate danger.

*Id.*

*Cordova* does not conclusively establish that Deputy Mora acted unreasonably. First, as noted earlier, the only question on appeal was "whether the potential risk to third parties created by Mr. Cordova's driving was alone sufficient to justify Officer Aragon's shooting him." *Id*. at 1188. This description alone sets *Cordova* apart since this case involves more than the general risk of reckless driving posed to a motoring public. And whereas in *Cordova* the parties agreed that the officers were not imperiled, here the parties heavily dispute the immediacy of the danger posed to Gaitan at the time Mora opened fire. The *Cordova* court conceded that if a reasonable officer could have feared for his life or those of other officers, those facts could shift the calculus. *See id.* Although it is a close call, there are genuine issues of material fact about whether an objectively reasonable officer would have perceived that the chase was ongoing and that officers were imperiled, and therefore a jury could conclude that Deputy Mora's firing at the Dodge was objectively unreasonable.

### ii. Clearly Established Law

Despite this conclusion, Mora is entitled to summary judgment on the ground that he did not violate clearly established law. "Qualified immunity attaches when an official's conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *White v. Pauly*, 137 S. Ct. at 551–52 (2017) (quoting *Mullenix v. Luna,* 136 S.Ct. 305, 308 (2015) (per curiam)). Although "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has [not] previously been held unlawful,'" *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)), "[f]or a right to be clearly established there must be Tenth Circuit or Supreme Court

precedent close enough on point to make the unlawfulness of the officers' actions apparent." *Mascorro v. Billings,* 656 F.3d 1198, 1208 (10th Cir.2011). "[T]he dispositive question is 'whether the violative nature of *particular* conduct is clearly established,'" *Mullenix*, 136 S.Ct. at 308 (quoting *Ashcroft v. al–Kidd,* 563 U.S. 731, 742 (2011)), and "[t]he inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *id.* (quoting *Brosseau v. Haugen,* 543 U.S. 194, 198 (2004) (per curiam)). It bears noting that in the context of excessive force cases involving car chases, the Supreme Court has "'never found the use of deadly force in connection with a dangerous car chase to violate the Fourth Amendment, let alone to be a basis for denying qualified immunity' where an officer reasonably believed he or others were in danger." *Johnson v. Peay*, 704 F. App'x 738, 743 (10th Cir. 2017) (quoting *Mullenix*, 136 S.Ct. at 310).

It appears that Plaintiff cites to the Supreme Court's decision in *Tennessee v. Garner*, 471 U.S. at 11, to show that the law was clearly established at the time of the incident. She quotes and emphasizes the following language: "A police officer may not seize an unarmed, nondangerous suspect by shooting him dead." However, the Plaintiff describes the right at too general a level. The "clearly established" inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Brosseau*, 543 U.S. at 198. "Such specificity is especially important in the Fourth Amendment context, where the Court has recognized that '[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.'" *Mullenix*, 136 S. Ct. at 308 (quoting *Saucier*, 533 U.S. at 205).

Plaintiff has not cited, and the Court has not found, caselaw establishing that an officer may not shoot a driver who dangerously flees from police and who, once momentarily

apprehended, revs his engine at an officer positioned behind patrol cars that are in the fleeing vehicle's projected path. If anything, Supreme Court precedent indicates the opposite. The Supreme Court's 2014 decision in *Plumhoff v. Rickard* establishes that as of November 2017, the date of the events in question, it was not clearly established that an officer must refrain from using deadly force to terminate a dangerous chase where the driver continues to push down on the car's accelerator even though the car may have come to a temporary stop. Accordingly, the Court grants Defendants' motion for summary judgment on Count I.

### C. Plaintiff's Rule 56(d) Motion

As noted earlier, Plaintiff filed no response to Defendants' separate summary judgment motion on Count II, Plaintiff's *Monell* and supervisory liability claims. Instead, she moved under Rule 56(d), which allows a court to deny or defer considering a motion for summary judgment where the "nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d). "In this circuit, a party seeking to defer a ruling on summary judgment under Rule 56([d]) must provide an affidavit "explain[ing] why facts precluding summary judgment cannot be presented." *Valley Forge Ins. Co. v. Health Care Mgmt. Partners, Ltd.*, 616 F.3d 1086, 1096 (10th Cir. 2010) (citation and internal quotation marks omitted). "This includes identifying (1) the probable facts not available, (2) why those facts cannot be presented currently, (3) what steps have been taken to obtain these facts, and (4) how additional time will enable [the party] to obtain those facts and rebut the motion for summary judgment." *Id*.

To better contextualize Plaintiff's Rule 56(d) motion, it makes sense to briefly state the legal standards for Plaintiff's municipal and supervisory liability claims. "A § 1983 suit against a municipality for the actions of its police officers requires proof that (1) an officer committed a

constitutional violation and (2) a municipal policy or custom was the moving force behind the constitutional deprivation that occurred." *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1264 (10th Cir. 2008) (citation omitted). To establish municipal liability under § 1983, Plaintiff must prove a constitutional violation by the individual officer. *See id.* ("without the predicate constitutional harm inflicted by an officer, no municipal liability exists.") (citing *City of Los Angeles v. Heller,* 475 U.S. 796 (1986)). "A challenged practice may be deemed an official policy or custom for § 1983 municipal-liability purposes if it is a formally promulgated policy, a well-settled custom or practice, a final decision by a municipal policymaker, or deliberately indifferent training or supervision." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 770 (10th Cir. 2013). To proceed with a municipal liability claim, "the plaintiff must show that a policymaker, which could be the chief of police, among others, was deliberately indifferent." *Brown v. Gray*, 227 F.3d 1278, 1289 (10th Cir. 2000).

Against Sheriff Gonzales, Plaintiff's claim of direct supervisory liability requires proof of the sheriff's "*direct personal responsibility*" for the claimed deprivation of Plaintiff's constitutional right. *See Porro v. Barnes*, 624 F.3d 1322, 1327 (10th Cir. 2010) (emphases in original). Plaintiff "must show an 'affirmative link' between the supervisor and the constitutional violation," *Schneider,* 717 F.3d at 767, which requires proof of three interrelated elements: "(1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation." *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010).

Here, Defendants contend that in the parallel state-court case the parties conducted "significant" discovery, including taking depositions of the three officers whose testimony

Plaintiff relies on in support of her Rule 56(d) motion. Defendants argue that Plaintiff has these three depositions at hand, and that Plaintiff therefore fails to make use of information already available to her. Defendants also complain that Plaintiff's discovery request lacks specificity since she does not list requests for product or interrogatories.

The Court concludes that the affidavit filed by Plaintiff's lawyer satisfies the *Valley Forge* requirements. He requests on Plaintiff's behalf discovery of Mora's "personnel records, including records of his prior incidents of use of force and vehicle pursuits," and a BCSO spreadsheet that would compile Mora's vehicle pursuits. ECF No. 37-1 at 2. Plaintiff also seeks to depose Captain Taylor and Lieutenant Lori Carillo, the two officers who initiated the Early Warning Alert review. Given what Plaintiff has learned from Leonard Armijo and Ryan Tafoya about Mora's alleged violence as a cadet and later as a deputy, Plaintiff contends that the discovery she requires will support her claims for municipal and supervisory liability, specifically "that Defendants were deliberately indifferent in the supervision and training of [Mora]." *Id.* Given that a jury could reasonably conclude that Mora's conduct violated the Fourth Amendment, Plaintiff's municipal and supervisory liability claims remain actionable. Plaintiff is entitled to seek discovery as set forth in Mr. Bregman's affidavit. The parties will meet with United States Magistrate Judge Kevin R. Sweazea to arrange case scheduling.

**IT IS THEREFORE ORDERED that**:

- Defendants' Motion for Partial Summary Judgment No. 1: Dismissal of Plaintiff's Fourth Amendment Excessive Force Claim **[ECF No. 25]** is **GRANTED** and that Plaintiff's claim against Defendant Joshua Mora in his individual capacity is **DISMISSED with prejudice**;

- Plaintiff's Motion to Deny or Defer Ruling on County Defendants' Motion for Partial Summary Judgment No. II **[ECF No. 37]** is **GRANTED**;

- Defendants' Motion for Partial Summary Judgment No. II: Dismissal of Plaintiff's Municipal Liability (Policies, Customs, Patterns, and Practices), Failure to Train, and Supervisory Liability Claims **[ECF No. 26]** is **DENIED without prejudice**.

**IT IS SO ORDERED**.


_____
Senior United States District Court Judge